12696

HILL v. BROAD RIVER POWER CO.

(148 S. E., 870)

*Messrs. Elliott, McLain, Wardlaw & Elliott,* for appellant,

*Messrs. A. F. Spigner,* and *James S. Verner,* for respondent,

July 5, 1929.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

This suit, growing out of the alleged wrongful death of plaintiff's intestate, N. B. Hill, was tried in the Court of Common Pleas for Richland County before Hon. H. F. Rice, Circuit Judge, and a jury. There was a directed verdict in favor of the defendant as to punitive damages. Defendant's motion for a directed verdict as to actual damages was refused. The jury returned a verdict in favor of the plaintiff for actual damages. The appeal is by the defendant from that verdict and the judgment thereon. The exceptions all relate to the trial Judge's refusal to direct a verdict as to actual damages. These charge error on the part of Judge Rice in refusing to direct the requested verdict on these grounds: (1) That there was not sufficient evidence of actionable negligence; (2) that the only reasonable inference to be drawn from the evidence was that plaintiff's intestate assumed the risk of the work he was engaged in; and (3) that the deceased was guilty of contributory negligence.

This Court has been much impressed with the statement of facts and the argument of counsel for the respondent, and we think these cover and set forth all that is necessary for us to say in this case. We have, therefore, with appropriate changes, adopted that statement and argument as the opinion of the Court.

The plaintiff alleged that, while her intestate was working for the defendant as foreman of one of several squads of laborers engaged in clearing up a right-of-way for a line of power wires, a tree fell upon him, and he was killed. As to the cause of the falling of the tree, the plaintiff alleged:

"6. That on April 1, 1927, and for several days prior thereto, the defendant company had a squad working under another foreman, the servant and agent of the defendant, on the right-of-way hereinabove mentioned, at a point between the Broad and Saluda Rivers and about three miles west of the City of Columbia, where there was a very thick and

heavy growth of trees and bushes. That said squad of men in opening said right-of-way carelessly and negligently and with willful disregard of the rights of others having to pass along said right-of-way, nearly severed and cut a large tree from its stump and roots but left the same standing with its gaping wounds concealed in a growth of bushes, briars and weeds; the said defendant knowing that to leave said tree so standing would greatly endanger the lives of those passing along said right-of-way, and also well knowin that plaintiff's intestate and others would be passing that way in the discharge of their duties."

"9. That the death of the plaintiff's intestate was due to the carelessness, negligence, willfulness and wantonness of the defendant, its servants and agents in cutting and leaving said tree, which fell upon the plaintiff's intestate, standing, but liable to fall at any minute; in failing to furnish the plaintiff with a safe place to work, the place being unsafe by reason of the cut, but unfelled tree, standing in a concealed place and in failing to warn the plaintiff of the latent danger of working at said place under the circumstances."

By its answer, the defendant pleaded a general denial, contributory negligence, and assumption of risk on the part of the plaintiff's intestate.

It appears that, when the appellant served its proposed transcript of record, there was in it the following statement:

"Under this general head the defendant argued:

"(a) That deceased was sole representative of the master, was in charge of the work, and hence responsible for the condition under which the cutting was being undertaken;

"(b) He assumed the risk of the work;

"(c) That he was guilty of contributory negligence.

"(After argument, the Court sustained the motion as to punitive damages, but overruled the motion as to the second ground of the motion and submitted the case to the jury.)"

As amendment of the proposed transcript, the respondent suggested that the statement above quoted should be stricken

out and the stenographic record of the motion for a directed verdict by the defendant inserted in lieu thereof. The amendment was not agreed to, and the case was submitted to Judge Rice for settlement. By his order settling the case, Judge Rice ordered: "That the proposed amendments of respondent be and the same are hereby allowed and that the proposed case as amended shall constitute the case for appeal, with leave to the appellant to set out the foregoing matter in an appendix to the case, if it deems advisable."

The matter which Judge Rice gave leave to have printed in the appendix is that part of the proposed case, which his Honor ordered should be stricken out of the record.

From the order settling the case, or transcript of record, the appellant did not appeal. This Court, then, can consider as having transpired at the trial of the cause only that which the Court stated took place. And in this connection we note that the only questions raised on the motion for a directed verdict were as to the sufficiency of the evidence to sustain a verdict of actual and punitive damages. See *Southern Pine Lumber Co. v. Martin,* 118 S. C., 319, 110 S. E., 804; *Glenn v. Southern Railway Co.,* 145 S. C., 41, 142 S. E., 801; *Kneece v. Hall,* 138 S. C., 157, 135 S. E., 881.

No question as to the assumption of risk or contributory negligence then having been made in the motion for a directed verdict, the appellant cannot now complain that the Court erred in not directing a verdict for the defendant on account of the plaintiff's assumption of risk or contributory negligence. See *Gilliland v. Railway,* 86 S. C., 137, 68 S. E., 186, where at page 140 (68 S. E., 187) it appears that: "At the close of the plaintiff's testimony, the defendant's attorneys made a motion for a non-suit, on the grounds that there was no evidence of negligence on the part of the defendant, and that the testimony showed that the plaintiff was guilty of contributory negligence." On appeal from a judgment rendered for the plaintiff in that case the

Court said: "We have not discussed the question whether it appeared from the evidence, that the plaintiff assumed the risk which caused the injury, as this was not made a ground for non-suit, or for a new trial." See, also, *Thomas Drug Store v. National Surety Co.,* 104 S. C., 190, 88 S. E., 442; *Hill v. Railway Co.,* 67 S. C., 548, 46 S. E., 486; *Mims v. Hair,* 80 S. C., 460, 61 S. E., 968.

By the only exception, then, which assigns error to any ruling by the Court below, the appellant says that there was not sufficient evidence of actionable negligence to warrant the case being submitted to the jury.

Since one cannot recover damages of another unless the second has failed to discharge a duty which he owed to the first, and since in this case the plaintiff alleges that the defendant cut the tree, and left it standing as above described, the inquiry is: Did the defendant owe the plaintiff's intestate the duty not to so cut and leave the tree? The duty which one owes to another under such circumstances is declared in verses 33–34 of the Twenty-first chapter of Exodus, as follows:

"33. And if a man shall open a pit, or if a man shall dig a pit, and not cover it, and an ox or an ass fall therein;

"34. The owner of the pit shall make *it* good, *and* give money unto the owner of them; and the dead *beast* shall be his."

It is a long cry from Moses to the present day, but there has been little change in the law in the meantime, as shown in the case of *Bradford v. Woolworth Co.,* 141 S. C., 453, 140 S. E., 105, where, quoting from 20 R. C. L., 55, 56, it was said:

"The authorities are entirely agreed upon the proposition that an owner or occupant of lands or buildings who directly or by implication invites or induces others to go thereon or therein owes to such persons a duty to have his premises in a reasonably safe condition and to give warning of latent or concealed perils. In the language of a recent opinion: "The

law is well settled that an owner or occupant of land who by invitation, express or implied, induces or leads others to go upon premises for any lawful purpose is liable for injuries occasioned by the unsafe condition of the land or its approaches, if such condition was known to him and not to them.' If there are hidden dangers upon the premises he must use ordinary care to give warning thereof. While the rule has been applied in innumerable situations, it has been invoked most frequently, perhaps, in the case of injuries from unguarded excavations, unprotected stairways, hatchways, trapdoors, turnstiles, revolving or swinging doors, and collapsing buildings. The facts of the particular case are, of course, controlling upon the question of negligence, and the decision thereon is properly within the sphere of the jury." 20 R. C. L., 55, 56.

And in the same case Mr. Chief Justice Watts, basing his conclusion on the cases of *Grainger v. Rwy.*, 101 S. C., 73, 85 S. E., 231; *Branch v. Ry.*, 35 S. C., 405, 14 S. E., 808; *Lasure v. Graniteville Mfg. Co.*, 18 S. C., 275; *Trimmier v. Railway*, 81 S. C., 203, 62 S. E., 209, said:

"The law imputes to the master knowledge of latent danger in his instrumentalities and casts on him the burden of proving that he could not have discovered the danger by the exercise of due diligence. *Trimmier v. Railway*, 81 S. C., 203, 62 S. E., 209."

Two cases involving death or injury from falling trees have been in recent years before this Court. *Kinsey v. Colleton Cypress Co.*, 118 S. C., 234, 110 S. E., 395, and *Grier v. Winyah Lumber Co.*, 144 S. C., 10, 141 S. E., 685. In the *Kinsey case*, the plaintiff alleged that the death of her intestate was due to the carelessness of the defendant in (a) failing to instruct the deceased of the danger, (b) in failing to warn the deceased of the danger in felling trees, (c) in failing to warn an inexperienced servant, (d) in not furnishing the deceased with a safe place to work. In disposing of specification (a), the Court said:

"The instructions to which the testimony referred were instructions that would enable the cutter to avoid injury from the tree that was being cut down. There is no presumption of negligence here. The injury in this case was not from the tree that was being cut down, but from the dead tree. The testimony in the case utterly failed to connect the fall of the dead tree with the fall of the tree that was cut down. The plaintiff's witness, Varn, said he did not know what caused the dead tree to fall. Indeed, the appellant's argument frankly states 'the cause of the falling of the dead tree being unknown.' This specification is not made out."

In disposing of specification (b), the Court said:

"(b) The next allegation of negligence is like the first—a failure to warn the deceased of the dangers of felling trees. What is said above determines this specification, and it cannot be sustained."

In passing on specification (c), the Court said the same was not supported by the evidence. As to specification (d) —failing to furnish the deceased a safe place to work—the Court said:

"The plaintiff emphasized the danger of felling trees. It is conceded in this case that felling trees is a dangerous business, and that the deceased knew it. It is not suggested that it is the duty of the master to free the woods of dead trees before his employees should be allowed to enter upon their work. The master is liable for negligence in failing to provide a reasonably safe place, considering the nature of the work. When the plaintiff failed to connect the fall of the dead tree in any way with the felling of the tree, she failed to make out her case, and a verdict should have been directed."

The case at bar is readily distinguishable from the *Kinsey case* by the fact that, while in the latter case the defendant did nothing whatever to cause the tree which fell on the deceased—a dead tree standing in the forest—to fall, in the case at bar, the defendant by almost severing a live, grow-

ing tree, and leaving it standing in that condition, caused the tree to fall. The two cases are also distinguishable by the fact that in the *Kinsey case* the dead tree was plainly visible —a patent danger, while that which caused the tree to fall in the case at bar was latent, or concealed—the hacked place on the tree concealed in undergrowth and bushes. And further, while in the *Kinsey case* the defendant did nothing to render a dangerous place more dangerous, in the case at bar the defendant increased the danger.

In the *Grier case,* the cause of action was based on the alleged negligence in failing to furnish the plaintiff a safe place to work; the plaintiff alleging that the defendant was at the time engaged, through its servants and agents, in cutting down a large tree which was in close proximity to the place where the plaintiff was at work splitting logs, and in failing to warn him of the danger to which he was exposed.

As shown by the evidence in the case at the time of his injury, the plaintiff Grier was engaged in splitting logs while two other laborers were sawing down a tree near where he was working, and the tree which these two laborers were cutting down fell on the plaintiff. These laborers, however, were in plain view of the plaintiff, who both saw and heard them at work.

With reference to the law and facts in that case, the Court said:

"1. Was there any evidence showing negligence on the part of the defendant in failing to furnish the plaintiff a reasonably safe place to work? We think not. As said in *Brabham v. Telegraph Co.,* 71 S. C., 53, 50 S. E., 716, 'the place and character of such work (felling and removing trees) necessarily involved some danger as an incident of that kind of employment.' The plaintiff had had several years' experience in logging, and must have known of the existence of such danger, which was open and obvious, and could as readily have been known and appreciated by him as by the defendant. As in *Wofford v. Cotton Mills,* 72 S. C., 346, 51

S. E., 918, there was no 'evidence of disability or lack of experience or ordinary intelligence. The risk was obvious, and could not fail to be comprehended by a person of meager, not to say ordinary, understanding.'

"The nature of the work and the circumstances of the employment being taken into consideration, the place of work was safe enough in the first instance. Whatever danger there was arose during the progress of the work, but unless it arose through the negligence of some one performing non-delegable duties of the master to the plaintiff—'in charge for the master,' as said in *Leopard v. Beaver Duck Mills,* 117 S. C., 122, 108 S. E., 190—its existence cannot be imputed to negligence of the master. The evidence admits of no other inference than that Avant, Goude, the plaintiff, and Haselden were engaged in a common undertaking, and that, in sawing the tree which fell on the plaintiff, Avant and Goude were engaged in the performance of the ordinary duties of their employment, and not in the performance of any duty owing by the master to the plaintiff, and were therefore fellow-servants of the plaintiff."

Counsel for appellant takes the position that the plaintiff's intestate, and Derrick, the other foreman, were fellow-servants engaged in a common enterprise. But the evidence shows that they were not; at least that there was evidence to go to the jury on that question. While the evidence shows that they were both engaged in doing the same kind of work, they were not working together, nor at the same place. Derrick testified that the squad with which he was working, and which cut and left the tree standing, left the same three days before the tree fell on Mr. Hill. This being true, it would indicate that Derrick and Hill were not fellow-servants. The danger did not arise by an act of omission or commission of the foreman, Derrick, omitted or committed while he and the deceased were engaged in a common enterprise, but the dangerous condition grew out of an omission of duty that the master owed not only to the deceased,

but to all having any business upon the premises as servant, licensee or otherwise. The fact that the deceased was at work for the defendant at the time he was killed merely shows that he had the right to be where he was.

Moreover, the question of assumption of risk was properly submitted to the jury under the case of *Kirkland v. Railway Co.*, 128 S. C., 47, 52, 121 S. E., 594, 596, in which case the Court, quoting from *Railway Co. v. Horton*, 233 U. S., 504, 34 S. Ct., 640, 58 L. Ed., 1062, L. R. A., 1915-C, 1, Ann Cas. 1915-B, 475, said:

"Such dangers as are normally and necessarily incident to the occupation are presumably taken into the account in fixing the rate of wages. And a workman of mature years is taken to assume risks of this sort, whether he is actually aware of them or not. But risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care with respect to providing a safe place of work and suitable and safe appliances for the work. These the employee is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike, are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them. These distinctions have been recognized and applied in numerous decisions of this Court."

See, also, *Kelly v. Keystone Lumber Co.*, 107 S. C., 96, 91 S. E., 978, where the Court said: "Assumption of risk is an affirmative defense, and his Honor, Judge Shipp, could not have directed a verdict."

In *Pinckney v. Railway Co.*, 92 S. C., 528, 75 S. E., 964, the Court said: "In order to escape liability on the ground of negligence of a fellow-servant, it must appear that the master was not negligent at all as to any of the proximate causes of plaintiff's injury."

In *Elms v. Power Co.*, 79 S. C., 502, 60 S. E., 1110, the Court approved this instruction to the jury: "The servant

assumes the dangers incident to his employment, but does not assume the dangers of defective machinery, methods or surroundings, unless he knows it, or unless a man of ordinary prudence, reason and sense, placed in cimilar circumstances, ought to have known.".

The judgment of this Court is that the judgment of the lower Court be, and the same is hereby, affirmed.

MR. CHIEF JUSTICE WATTS, and MESSRS. JUSTICES STABLER and CARTER concur.

MR. JUSTICE COTHRAN (dissenting) : Action for damages on account of the death of the intestate, N. B. Hill, alleged to have been caused by the wrongful act of the defendant.

It appears that, at the time of his injury and death, the intestate was employed by the defendant as foreman of a force of laborers engaged in clearing the land of trees and underbrush over a certain part of its right-of-way acquired for the construction of a power line. Another foreman, of equal rank with Hill, one Derrick, had been engaged, the day before the fatal accident to Hill, in similar work, at a point which the area assigned to Hill on the day of the accident overlapped. Derrick, with his force, was transferred to a distant portion of the right-of-way to perform the same kind of work.

The evidence tends to show, and upon this appeal from the refusal of the defendant's motions for a non-suit and for a directed verdict, it will be assumed to be true, that, when Derrick quitted the area in question the afternoon before the accident, there was left unfelled in the area a pine tree, 10 or 12 inches in diameter at the stump, which had been cut on each side, nearly through.

The complaint alleges that Hill "and the squad he was working with in the execution of his work in clearing up said right-of-way, came to the place where the other squad had left off their task, *and while he and his squad were cutting and felling trees,* the tree hereinabove described sud-

denly fell on him, striking him with such force and violence that he died in a very short time."

The evidence also tended to show that the unfelled tree was surrounded by thick underbrush which concealed from observation the fact that it had been cut as described above.

It will be observed that the complaint does not allege the *cause of the fall* of the tree other than its partially cut condition.

It is alleged:

"That the death of the plaintiff's intestate was due to the carelessness, negligence, willfulness and wantonness of the defendant, its servants and agents in cutting and leaving said tree, which fell upon the plaintiff's intestate, standing, but liable to fall at any minute; in failing to furnish the plaintiff with a safe place to work, the place being unsafe by reason of the cut but unfelled tree standing in a concealed place, and in failing to warn the plaintiff of the latent danger of working at said place under the circumstances."

The evidence for the plaintiff offers no explanation of the cause of the falling of the tree. Taken in connection with the allegation of the complaint (by which the plaintiff is concluded) that, at the time of the fall of the tree, Hill with his force *"were cutting and felling trees,"* the Court is justified in accepting the evidence on behalf of the defendant that the partially cut trees had lodged upon another tree, and that, while Hill with a force of four hands was engaged in cutting down two trees, neither of which was the tree upon which the cut tree had lodged, the latter was dislodged and fell upon him. This theory finds support in the examination of the witness for the defendant (Senn) by counsel for the plaintiff:

"Q. And you say it (the wind) was blowing. If that tree was partially cut, wouldn't you say the jar from those large trees Hill's men were cutting could have caused it to fall, helped by the wind? A. I guess either one of those trees—

the tree it was leaning on was eight or ten feet from them, but it didn't touch it.

"Q. But the jar from either one of those trees that fell could have caused it to fall? A. It could have.

"Q. And the wind sort of helping the tree could have thrown it down, if it was just holding on to that other tree—leaning over? A. Why it could have, if it was a light hold."

This, we think, is the only reasonable explanation of the downfall of the tree. It is not reasonable to suppose that a member of the Derrick force cut a tree nearly half way through on each side and left it standing erect; it is much more reasonable that in its fall it lodged against a nearby tree and was left in that condition by the transfer of the squad to another field of endeavor, knowing that the felling of the supporting tree would carry it down, too.

Unless this theory be accepted, it is absolutely conjectural what caused the fall of the tree, and impossible to ascribe it therefore to the negligence of the defendant.

In the case of *Green v. R. Co.*, 72 S. C., 398, 52 S. E., 45, 5 Ann. Cas., 165, the Court quotes with approval the following from 2 Labatt on Master and Servant (1st Ed.) § 837: "A servant cannot recover where it is merely a matter of conjecture, surmise, speculation, or supposition, whether the injury was or was not due to the negligence of the master." See, also, *Holmes v. Davis,* 126 S. C., 231, 119 S. E., 249.

If, then, the only theory suggested by either of the parties be accepted, the question arises whether an inference of negligence can be legitimately drawn therefrom.

It has not been shown that there was sufficient wind at that particular time to overthrow the tree; it could not have been leaning, with the gash in its sides, without falling, unless supported by the tree upon which it lodged, for, its equilibrium having been disturbed, gravitation would not have been arrested.

The plaintiff's sole reliance is upon the fact that it was cut partly through on each side; was still standing erect, and that the "gaping wounds" were concealed from the obser-

vation of the intestate, by the underbrush. If the underbrush had not been there and the intestate had observed the condition of the tree, is there the remotest probability that he would have taken any precaution to avoid the consequence of its remotely probable fall? What was there to make it fall? The plaintiff has not offered the slightest reason. It had stood there through the previous afternoon and night and half of the morning. Conditions are not shown to have changed. If there could be considered the slightest ground for apprehension that the jar from the felling of other trees within ten feet of it would cause it to fall, after it had lodged against the other tree, its position was plainly observable by the intestate. If he did not consider it dangerous, why should the defendant be charged with the duty of apprehension?

Should the theory that the cut tree was dislodged by the concussion caused by the fall of the other trees which Hill and his gang were engaged in cutting be not accepted, there is nothing in the case to show the cause of its fall. The case would therefore fall squarely under the case of *Kinsey v. Colleton Cypress Co.,* 118 S. C., 234, 110 S. E., 395. In that case Kinsey and another were engaged in felling a live tree; as it started to fall, Kinsey ran away from it, and, as declared in the opinion "for some unaccountable reason the dead tree fell on him and crushed his head." The Court held:

"The master is liable for negligence in failing to provide a reasonably safe place, considering the nature of the work. When the plaintiff failed to connect the fall of the dead tree in any way with the felling of the tree, she failed to make out her case, and a verdict should have been directed."

(Speaking for himself, the writer is under the impression that the evidence in the *Kinsey case* showed either that the falling live tree carried the dead tree down with it, or that the concussion with the ground caused the fall of the dead tree. In that event the case at bar, under the dislodgment theory, would be governed by the principle announced in the *Kinsey case:* "It is not suggested that it is the duty of the master to free the woods of dead trees before his employees

should be allowed to enter upon their work." There appears no possible distinction between a dead tree and one that is lodged against another.)

For these reasons the defendant's motion for a directed verdict in its favor should have been granted.

There is another reason why the motion should have been granted:

The evidence is not at all clear that the tree was partially cut by the squad under the direction of Derrick; but, assume that it was, the negligence, if negligence at all, in leaving the tree lodged against one of its neighbors, was that of a fellow-servant of the intestate, for which the defendant cannot be held responsible.

It appears that the entire work of clearing the right-of-way was under the direction and control of one Ferguson, called "the boss," who hired and directed all of the employees; there were two gangs or squads engaged in different areas of the right-of-way; one was under foreman Hill, the intestate, and the other under foreman Derrick; each of these foremen received orders directly from Ferguson and worked independently of each other. The case of *Wilson v. V. C. Chemical Co.*, 78 S. C., 381, 58 S. E., 1019, is conclusive of the proposition that Hill and Derrick were fellow-servants, and that the employees under each were fellow-servants of the other foreman; so that, whether leaving the tree in a partially cut condition, erect, or lodged against another tree, was the negligent act of either Derrick or one of his squad, there can be no recovery.

In the *Wilson case* there were two gangs of laborers at work, each under a separate foreman, both of whom were under the direction of one Happolt, "who was the boss in charge of all the laborers referred to in the testimony"; the one gang under foreman Robinson was engaged in pushing a car loaded with phosphate rock along a track which led close to the door of a warehouse into which the rock was being discharged; the other gang under foreman Sanders was

engaged in shoveling up scattered phosphate rock from the space in front of the door of the warehouse. Wilson was working at the warehouse under foreman Sanders. The complaint alleged, and the Court held, that there was sufficient evidence to sustain the allegation for submission of the issue to the jury that, "while so engaged and intent upon his work, a railroad car, loaded with phosphate rock, was carelessly and negligently pushed along said railway track by the agents and employees of the said defendant company; that no signal was made, nor warning given of the movement of said car," resulting in Wilson's being struck by the car and crushed to death between it and the building.

In passing upon the defense of fellow-servant, the Court said:

"There is not the least doubt, however, that the men who were pushing the car, including Robinson, who was the foreman, were fellow-servants of Wilson, and the non-suit should have been granted on that ground. Charlie Sanders was the miller and foreman of those working in and immediately at the mill, and deceased and White were working under his orders. Sam Robinson was foreman of the gang pushing the car. He and Sanders were nothing more than gang foremen, both working under the orders of Happolt, who was the boss in charge of all the laborers referred to in the testimony. These foremen had no power to hire laborers, provide machinery or the place of labor, or to do any duty imposed by law on the master. They were, therefore, fellow-servants of the deceased and the master is not responsible for their negligence"—citing *Shirley v. Abbeville Co.*, 76 S. C., 452, 57 S. E., 178, 121 Am. St. Rep., 952, and authorities cited. *Tucker v. Buffalo Mills*, 76 S. C., 539, 57 S. E., 626, 121 Am. St. Rep., 957; *Biggers v. Catawba Co.*, 72 S. C., 264, 51 S. E., 882; *Bryant v. Mfg. Co.*, 75 S. C., 487, 56 S. E., 9.

The contention that the place where Hill was directed to work was made unsafe by the negligent act of either Derrick or one of his gang of laborers, and that for that reason the

defense of fellow-servant cannot prevail, upon the theory that the duty of providing a reasonably safe place is a non-delegable one, cannot be sustained.

In the first place, we do not think that the evidence tended to show that the place was *negligently unsafe,* as we have endeavored to demonstrate; but, assuming that it was, the rule is well settled that, before the master can be held liable for the negligent act of a servant making the place unsafe, it must appear that the servant offending had been charged with the specific duty of providing a reasonably safe place; that he was the master's *alter ego.*

In *Shirley v. Furniture Co.,* 76 S. C., 452, 57 S. E., 178, 121 Am. St. Rep., 952, the Court said:

"* * * The Circuit Judge instructed the jury in substance, as follows: As one of the non-delegable duties of the master is to furnish a safe place to work, the master would be liable for any injury resulting to the servant from working in an unsafe place at the direction of any one *authorized by the master,* either directly or indirectly, *to assign the servant to a place of labor.* Conversely, if the servant was injured in consequence of working in an unsafe place, where he had gone on the order of a mere fellow-servant not authorized by the master to assign his place of labor, the master would not be liable, because with respect to the master, the fellow-servant undertaking to give the order would be a mere volunteer. This statement of the law is in accord with the principles laid down in *Gunter v. Graniteville Co.,* 18 S. C., 270 [44 Am. Rep., 573]; *Calvo v. Railroad Co.,* 23 S. C., 526 [55 Am. Rep., 28]; *Jenkins v. R. R. Co.,* 39 S. C., 510, 18 S. E., 182 [39 Am. St. Rep., 750]; *Wilson v. R. R. Co.,* 51 S. C., 96, 28 S. E., 91; *Brabham v. Tel. Co.,* 71 S. C., 53, 50 S. E., 716; *Martin v. Guano Co.,* 72 S. C., 237 [51 S. E., 680]. The cases of *Calvo v. Railway, supra,* and [*Branham*] *v. Cotton Mills,* 61 S. C., 491, 39 S. E., 708, are particularly applicable."

In *Goodman v. Tel. Co.,* 87 S. C., 449, 69 S. E., 1089, the injured servant was one of a telegraph line force engaged in stringing wires and working under a foreman named Melton, who had the authority of not only directing the squad, but of employing and discharging the hands. The plaintiff was required to climb the pole and fasten the wire to the bracket; the line was then to be pulled tight by the men on the ground, but not until the plaintiff had notified them that it had been tied. Without notice from or warning to the plaintiff, the wire was tightened prematurely, and he was jerked to the ground. The record is not entirely clear whether the foreman pulled the wire or gave the order therefor; but, as the case went off upon the ground that the plaintiff and foreman were fellow-servants, it is assumed that his negligent act was the cause of the injury. The Court, after quoting from 26 Cyc., 1364, declares:

"At the time of the injury the duties of Melton were in no way connected with the employment and discharging of servants, but he was merely discharging the duties of a fellow-servant, as foreman of the gang."

In the case of *Alaska Mining Co., v. Whelan,* 168 U. S., 86, 18 S. Ct., 40, 42 L. Ed., 390, the injured servant was one of a squad engaged in breaking rock and preparing it to go in a chute, under the direction and control of a foreman. He was directed to break rock over one of the chutes, and while so engaged, the foreman drew the gate at the mouth of the chute, causing the rock at the head of the chute to be suddenly drawn in, carrying the plaintiff with it, a distance of 30 feet, covering him with rock and débris, thereby greatly injuring him. The Court directed a verdict for the defendant, holding:

"Finley [the foreman] was not a vice-principal or representative of the corporation. He was not the general manager of its business, or the superintendent of any department of that business. But he was merely the foreman or boss of the particular gang of men to which the plaintiff belonged.

Whether he had or had not authority to engage and discharge the men under him is immaterial. Even if he had such authority, he was none the less a fellow-servant with them, employed in the same department or business, and under a common head. There was no evidence that he was an unsuitable person for his place, or that the machinery was imperfect or defective for its purpose. The negligence, if any, was his own negligence in using the machinery or in giving orders to the men."

To the same effect is *Central R. C. v. Keegan,* 160 U. S., 259, 16 S. Ct., 269, 40 L. Ed., 418.

In *Kell v. Fertilizer Co.,* 123 S. C., 199, 116 S. E., 97, the Court said:

"If the danger in the servant's environment which eventuates in his injury is caused by the negligence of a fellow-servant in carrying out a detail of the work in a manner attributable to the fellow-servant's own delinquency and not to any breach of the master's non-delegable duties, the risk of such injury, implied from the contract of service, is held to have been assumed by the injured servant, and the master is absolved from liability. Hence, the accepted test in this jurisdiction, in determining who are fellow-servants, 'is in the character of the act being performed by the offending servant, whether it was the performance of some duty the master owed to the injured servant, *the performance of which duty the master had intrusted to the offending servant.'* "

In *American Co. v. Seeds* (C. C. A.), 144 F., 605, 11 L. R. A. (N. S.), 1041, the Court said:

"Nevertheless, this duty has its rational and legal limits. It does not extend to the guarding of the safety of a place or of a machine against its negligent use by the servants. The risk that a safe place will become unsafe, or that safe machinery will become dangerous, by the negligence of the servants who use them, is one of the ordinary risks of the employment which the servants necessarily assume when they accept it."

The Court further said that the master is not liable for "a thousand other acts of negligence of servants of railroad companies, which make the places where their fellow-servants are employed and the machinery which they are using more dangerous. But the duty of the master does not extend to guarding the places or the machinery he furnishes against the dangers of such acts. They are violations of the primary duty of the servants."

In *Baird v. Reilly* (C. C. A.), 92 F., 884, the Court said:

"When, however, it appears that the working place originally, and when the employee was sent to do the work there, was reasonably safe, but became unsafe at the particular time of the accident by causes that could not have been anticipated, by exigencies created in carrying out the details of the work, *or by the neglect of a fellow-servant,* a different rule is applicable."

In *Brown v. J. S. Scofields Sons Co.,* 174 N. C., 4, 93 S. E., 381, the plaintiff was working upon a tower underneath a workman painting it; the painter negligently allowed a pair of pliers to drop and injure the plaintiff. It was contended that the injury was due to the breach of the master's safe-place duty. The Court, however, denied the contention upon the authority of *Armour v. Hahn,* 111 U. S., 313, 4 S. Ct., 433, 28 L. Ed., 440, saying:

"The 'place' itself was perfectly safe, but the actual situation from which the injury arose was a temporary and changing incident of the performance of the work, and was, in effect, the negligence of a fellow-servant, which could not possibly have been foreseen or provided against by the defendant."

In *Gulf Transit Co. v. Grande* (C. C. A.), 222 F., 817, quoting syllabus, it was held:

"While it is the primary duty of the master to use reasonable care to provide the servant with a safe place in which to work, when that has been done, he is not liable for an unsafe

condition resulting from the manner in which the workmen carry on their work."

In *Howard v. Denver & R. G. R. Co.* (C. C.), 26 F., 837, the Court said:

"The negligent use by one employee of perfectly safe machinery will seldom be adjudged a breach of the master's duty of providing a safe place for other employees. Such a construction would make any negligent misplacement of a switch, any negligent collision of trains, even any negligent dropping of tools about a factory, a breach of the duty of providing a safe place."

In *Armour v. Hahn,* 111 U. S., 313, 4 S. Ct., 433, 28 L. Ed., 440, it was held:

"The obligation of a master to provide reasonably safe places and structures for his servants to work upon does not oblige him to keep a building, which they are employed in erecting, in a safe condition at every moment of their work, so far as its safety depends on the due performance of that work by them and their fellow-servants."

Referring to the duty of the master to provide his employees with a safe place of work and to his responsibility for injuries resulting from the place becoming unsafe through the negligence of laborers in the manner of conducting the work, it was said by the Court in the case of *Kreigh v. Westinghouse, Church, Kerr & Co.,* 214 U. S., 249, 29 S. Ct., 619, 53 L. Ed., 984:

"But while this duty is imposed upon the master, and he cannot delegate it to another and escape liability on his part, nevertheless the master is not held responsible for injuries resulting from the place becoming unsafe through the negligence of the workman in the manner of carrying on the work, where he, the master, has discharged his primary duty of providing a reasonably safe appliance and place for his employees to carry on the work, nor is he obliged to keep the place safe at every moment, so far as such safety depends on the due performance of the work by the servant and his fel-

low-workmen"—citing *Armour v. Hahn,* 111 U. S., 313, 4 S. Ct., 433, 28 L. Ed., 440, and *Perry v. Rogers,* 157 N. Y., 251, 51 N. E., 1021.

In *Hermann v. Mill Co.* (D. C.), 71 F., 853, the Court said:

"The word 'place,' in my judgment, means the premises where the work is being done, and does not comprehend the negligent acts of fellow-servants, by reason of which the place is rendered unsafe or dangerous. The fact that the negligent act of a fellow-servant renders a place of work unsafe is no sure and safe test of the master's duty and liability in this respect, for it may well be said that any negligence which results in damage to some one makes a particular spot or place dangerous or unsafe. To so hold would virtually be making the master responsible for any negligence of a fellow-servant which renders a place of work unsafe or dangerous. It would be doing the very thing which it is the policy and object of the general rule not to do. It would create a liability which the master could not avoid by the exercise of any degree of foresight or care."

There is no evidence tending to show that the defendant committed to the foreman Derrick or to any of his gang of laborers the duty of providing Hill with a reasonably safe place to work. If there was any act of negligence at all, it was the sporadic act of one of them in either leaving the cut tree standing erect or lodged against another tree. In neither event can the master be held liable for the unexpected and abnormal consequences claimed to have ensued.

The judgment of this Court should be that the judgment appealed from be reversed and the case remanded to the Court below for the entry of judgment in favor of the defendant under Rule 27.